# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number: 2022-NMSC-007**

**Filing Date: December 2, 2021**

**No. S-1-SC-37450**

**NICHOLAS T. LEGER as PERSONAL
REPRESENTATIVE for the ESTATE
OF MICHAEL THOEMKE and DANIEL
THOEMKE, individually,**

Plaintiffs,

v.

**NICHOLAS T. LEGER as assignee
of PRESBYTERIAN HEALTHCARE
SERVICES, and JOHN OR JANE
DOES 1-5,**

Defendants/Third-Party Plaintiffs-Petitioner,

v.

**RICHARD GERETY, M.D., and
NEW MEXICO HEART INSTITUTE,**

Third-Party Defendants-Respondents.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Gerald E. Baca, District Judge**

Released for Publication February 22, 2022.

The Vargas Law Firm, LLC
Ray M. Vargas, II
Albuquerque, NM

Carter & Valle Law Firm, P.C.
Richard J. Valle
Criostoir O'Cleireachain
Albuquerque, NM

for Petitioners

Atwood, Malone, Turner & Sabin, P.A.

Lee M. Rogers Jr.
Carla Neusch Williams
Roswell, NM

Lorenz Law
Alice Tomlinson Lorenz
Albuquerque, NM

for Respondents

## OPINION

**ZAMORA, Justice.**

## I.    INTRODUCTION

**{1}**    This opinion addresses the assignability of an indemnity claim under New Mexico's Medical Malpractice Act (MMA), NMSA 1978, §§ 41-5-1 to -29 (1976, as amended through 2021).[1] The question before us is whether the nonassignability provision of the MMA, § 41-5-12, which states that "[a] patient's claim for compensation under the [MMA] is not assignable," prohibits the assignment of a hospital's third-party indemnity claim against a qualified healthcare provider.

**{2}**    By way of brief procedural background, the decedent's personal representative, Petitioner Nicholas Leger, sued Presbyterian Healthcare Services (Presbyterian) for medical malpractice. Presbyterian then sued Respondents Dr. Richard Gerety and New Mexico Heart Institute for indemnification. Presbyterian ultimately settled the medical malpractice lawsuit with Petitioner and, as part of the settlement, assigned its indemnification claim to Petitioner. This appeal followed.

**{3}**    Petitioner asks us to adhere to the plain meaning of the MMA and hold that only patients' malpractice claims are unassignable and that all other types of malpractice claims are assignable. Respondents argue that we should look deeper into the legislative intent of the statute and hold that all malpractice claims, including third-party indemnity claims, are unassignable.

**{4}**    We conclude that because the plain language of the statute is unambiguous and abiding by it does not lead to an absurd result or unreasonable classification, Section 41-5-12 does not bar assignment of a third-party indemnity claim. Accordingly, we reverse the Court of Appeals and affirm the district court's determination that assignment of this indemnity claim is allowable under the MMA.

---

1The Legislature approved multiple amendments to the MMA in 2021. All citations in this opinion to the MMA or any of its provisions refer to the MMA as it existed prior to the 2021 legislative session, and the 2021 amendments are not implicated here.

## II.    BACKGROUND

**{5}**    We begin by setting forth the material facts of this case and the legal framework of both the MMA and common law indemnity before turning to the procedural posture of this appeal.

### A.    Factual Background

**{6}**    Because we granted certiorari to review this issue after the Court of Appeals reversed on interlocutory appeal, no jury has yet determined the facts or assigned liability to the parties. Our recitation of the facts is therefore taken from allegations in the record.

**{7}**    In December 2010, Michael Thoemke, age seventeen, presented to Presbyterian's High Resort Urgent Care facility in Rio Rancho with flu-like symptoms and difficulty breathing. Based on his presenting symptoms, Michael was transferred to Presbyterian's Rio Rancho Emergency Room and, approximately nine hours later, to Presbyterian Hospital in downtown Albuquerque, where he was admitted.

**{8}**    Upon admission to Presbyterian Hospital, Michael was diagnosed by an employee physician of Presbyterian with pneumonia and pleural effusions, a condition characterized by the escape of fluid into the pleural space around the lungs. *See Dorland's Illustrated Medical Dictionary* 589, 1438-39 (33d ed. 2020). Over the course of approximately one day, Michael was in the care of several physicians at Presbyterian Hospital, each of whom continued to treat him for pleural effusions. When Michael's condition failed to improve with treatment, his treating physician phoned Respondent Gerety, the cardiothoracic surgeon on call, to consult on the case. Following this consultation, Respondent Gerety examined Michael in the hospital, reviewed his computerized tomography (CT) scan, and determined that surgical drainage of the fluid around Michael's lungs was indicated. Immediately after Michael was intubated for the procedure, he suffered a "cardiopulmonary compromise" and his heartbeat arrested. Efforts to revive him were unsuccessful, and Michael died on the operating table.

**{9}**    Petitioner sued Presbyterian for wrongful death, negligence, and medical malpractice on behalf of Michael's estate. Michael's father, Daniel Thoemke, was Petitioner's co-plaintiff. The essence of the complaint was that three physicians either employed by or acting as the agents of Presbyterian, including Respondent Gerety, breached their duty of care to Michael, causing his death. Specifically, the complaint alleged that each of the doctors failed to identify the true cause of Michael's clinical symptoms, which the complaint alleged was pericardial effusion (the accumulation of blood around the heart), and that this failure led to Michael suffering a fatal "cardiac tamponade" when he was intubated and anesthetized for surgery. Importantly, Petitioner did not name any of the doctors identified in the complaint as parties to the suit, choosing to sue only Presbyterian.

**{10}**    In its answer to Petitioner's complaint, Presbyterian denied that any of its agents or employees acted negligently, and further denied that Respondent Gerety acted within

the course and scope of his employment or as an agent of Presbyterian. While the tort action was pending, Presbyterian also moved the district court for permission to file a third-party claim for equitable indemnification against Respondents Gerety and New Mexico Heart Institute, Gerety's employer. The district court granted the motion. In its claim for indemnification, Presbyterian asserted that, if it were found liable for negligence as a consequence of Respondent Gerety's actions, Presbyterian was entitled to indemnification from Respondents.

**{11}** Petitioner then moved to bifurcate the proceeding, seeking to stay the indemnity suit, and for a protective order against discovery propounded by Respondents. Presbyterian opposed both motions. Respondents did not unconditionally oppose the request for a stay but did oppose the motion for a protective order. The district court granted the stay and entered a protective order.

**{12}** Eventually, Presbyterian and Petitioner settled their claims through a confidential agreement. In it, Petitioner dismissed the tort action and released Presbyterian and its agents and employees from any and all claims arising from their treatment of Michael Thoemke in exchange for an undisclosed sum of money and an assignment of Presbyterian's indemnity claim against Respondents. Petitioner then moved to lift the stay of the indemnity proceeding and to amend the third-party complaint. Respondents did not oppose the motion to lift the stay but opposed the motion to amend on the grounds that, *inter alia*, Section 41-5-12 bars assignment of all malpractice claims, including indemnity claims. Whether this assignment was allowable is the issue we now address on certiorari.

## B.    Legal Background

**{13}** At the time Petitioner filed his first complaint, Presbyterian was not a qualified health care provider under the MMA. *See* § 41-5-5(A) (1992). As a result, Presbyterian was not entitled to the protection or benefit of the MMA in the underlying malpractice action. *See* § 41-5-5(C) ("A health care provider not qualifying under this section shall not have the benefit of any of the provisions of the [MMA] in the event of a malpractice claim against it."). However, Respondents were qualified health care providers, as defined in Section 41-5-5(A). Accordingly, the assigned indemnity claim against Respondent implicates both the MMA and common law indemnity principles. We address the legal framework of each cause of action below.

### 1.    Medical Malpractice Act

**{14}** The MMA was enacted in 1976 in response to "a perceived insurance crisis," after the underwriter of the New Mexico Medical Society's professional liability program announced that it would be leaving the state. *Baker v. Hedstrom*, 2013-NMSC-043, ¶ 16, 309 P.3d 1047 (internal quotation marks and citation omitted); *see generally* Ruth L. Kovnat, *Medical Malpractice Legislation in New Mexico*, 7 N.M. L. Rev. 5, 7-8 (1976) (discussing the insurance crisis in terms of the withdrawal of insurers as underwriters of the New Mexico Medical Society's professional liability program). Such a departure would have negatively affected the availability of professional liability coverage for "90%

of medical practitioners and health care institutions" in New Mexico. Kovnat, *supra*, 8 n.11. The Legislature's solution to this problem was to create a balanced statutory scheme for the litigation of medical malpractice cases, one that benefited both health care providers and patients. *See Baker*, 2013-NMSC-043, ¶¶ 17-19 (reviewing the benefits provided by the MMA to qualified health care providers and to patients). As described in the statute, the MMA's purpose "is to promote the health and welfare of the people of New Mexico by making available professional liability insurance for health care providers in New Mexico." Section 41-5-2 (1976).

**{15}** To achieve this purpose, the MMA changed certain aspects of the traditional, common law, medical negligence cause of action. *See generally Siebert v. Okun*, 2021-NMSC-016, ¶¶ 18-22, 485 P.3d 1265 (explaining the procedural differences between claims of medical negligence and claims of medical malpractice under the MMA). For example, as a benefit to would-be defendants, the MMA capped per-occurrence, nonmedical, nonpunitive damages awards at $600,000 and limited a qualified health care provider's personal liability to $200,000. *See id.*; § 41-5-6(A), (D) (1992). As a benefit to plaintiffs, the MMA created a patient compensation fund, supported by the contributions of qualified health care providers, to compensate for future medical damages and fill the gap in recovery for any remaining amount of damages in excess of the personal liability cap. *See* § 41-5-7 (1992); § 41-5-25 (1992, as amended 2021).

**{16}** In addition to the damages caps and patient compensation fund, the MMA also implemented several procedural changes. For instance, MMA plaintiffs must present claims to the New Mexico medical review commission, which assesses the claims to determine whether they meet certain evidentiary thresholds. *See* § 41-5-14 (1976, as amended 2021); § 41-5-15 (1976); § 41-5-20. The MMA also instituted a statute of repose, requiring plaintiffs to bring claims for medical malpractice "within three years after the date that the act of malpractice occurred." Section 41-5-13 (1976).

**{17}** The MMA's procedural requirements apply to the indemnity claim against Respondents for two interconnected reasons. First, both Respondents were qualified health care providers at the time of the alleged act of malpractice, so any malpractice suit against them must comply with the provisions of the MMA. *See* § 41-5-5; *see also Siebert*, 2021-NMSC-016, ¶ 4 ("Because [the d]efendants were 'qualified' health care providers as defined by the MMA, the provisions of the MMA applied to [the p]laintiff's suit for medical malpractice." (citing § 41-5-5(A). Second, the gravamen of the indemnity claim is based on Respondent's alleged medical malpractice. *See Christus St. Vincent Reg'l Med. Ctr. v. Duarte-Afara*, 2011-NMCA-112, ¶¶ 15, 18, 267 P.3d 70 ("[T]he controlling inquiry in determining whether a claim constitutes a 'malpractice claim' under the MMA is merely whether the gravamen of the claim is predicated upon the allegation of professional negligence."). In *Wilschinsky v. Medina*, we explained that third-party claims "fall[] within the purpose of the [MMA] and should be pursued according to its guidelines." 1989-NMSC-047, ¶ 28, 108 N.M. 511, 775 P.2d 713.

## 2. Common law indemnity

**{18}** "Traditional indemnification provides an indemnitee, who has been held liable for damages, the right to be made whole by a third party, such as the primary wrongdoer. [The] right to indemnification is based in equity and may arise . . . by express or implied contract, or by operation of law." *Budget Rent-a-Car Sys., Inc. v. Bridgestone*, 2009-NMCA-013, ¶ 12, 145 N.M. 623, 203 P.3d 154 (citation omitted). New Mexico recognizes both an all-or-nothing right of recovery based on the vicarious liability of the indemnitee for the negligence of the indemnitor, as well as proportional indemnification "which allows defendants to recover from a third[ ]party for the portion of a plaintiff's loss which the third[ ]party's conduct caused, even when the law does not apportion fault amongst tortfeasors under a theory of comparative fault." *Safeway, Inc. v. Rooter 2000 Plumbing & Drain SSS*, 2016-NMSC-009, ¶ 26, 368 P.3d 389. It is a "well-settled proposition that a cause of action for indemnification is separate and distinct from the underlying tort." *Duarte-Afara*, 2011-NMCA-112, ¶ 18.

**{19}** Here, Presbyterian brought an indemnity claim against Respondents to recover any loss suffered by Presbyterian as a result of its vicarious liability for Respondent Gerety's negligence in treating Michael Thoemke. *See generally* Restatement (Third) of Torts: Apportionment of Liability § 22(a) (2000) (defining indemnity as recovery of amount paid by indemnitee on behalf of indemnitor for vicarious liability in tort); *see Safeway*, 2016-NMSC-009, ¶ 33 (adopting Restatement (Third) of Torts: Apportionment of Liability § 22). To recover, Presbyterian would have to demonstrate that (1) Respondents were negligent and should be held liable for the direct harm caused to Michael Thoemke, (2) the relationship between Respondents and Presbyterian gave rise to vicarious liability, and (3) Presbyterian discharged Respondents' liability by settling with Petitioner. *See Duarte-Afara*, 2011-NMCA-112, ¶ 14 (stating that a properly pled indemnity claim must allege that the indemnitor caused direct harm to the plaintiff and that liability for the harm was discharged); *N.M. Pub. Schs. Ins. Auth. v. Arthur J. Gallagher & Co.*, 2008-NMSC-067, ¶ 24, 145 N.M. 316, 198 P.3d 342 ("New Mexico courts recognize actions for traditional equitable indemnification only when the indemnitor and the indemnitee have a pre-existing legal relationship apart from the joint duty they owe the injured party.").

**{20}** Because Presbyterian assigned its indemnity claim to Petitioner, Petitioner stands in the shoes of Presbyterian in proving these elements of indemnification. *See Inv. Co. of the Sw. v. Reese*, 1994-NMSC-051, ¶ 29, 117 N.M. 655, 875 P.2d 1086 ("[T]he common law [of assignments] speaks in a loud and consistent voice: An assignee stands in the shoes of his assignor." (internal quotation marks and citation omitted)).

## C. Procedural Background

**{21}** After Presbyterian assigned its third-party indemnity claim to Petitioner through settlement, Petitioner moved the district court to lift the stay of the indemnity claim. The district court granted the motion and allowed Petitioner to file an amended complaint substituting Petitioner for Presbyterian as indemnitee. Respondents sought dismissal of

the indemnity claim by summary judgment, arguing, *inter alia*, that Section 41-5-12 prohibited assignment of the claim. The district court denied Respondents' dismissal request, quoting *Duarte-Afara*, 2011-NMCA-112, ¶ 18, and reasoning that the claim was assignable because it was not a "personal injury claim[]" but a claim "separate and distinct from the underlying tort." The district court subsequently stayed the case pending interlocutory appeal to the Court of Appeals on the controlling question of law regarding the assignability of nonpatient claims.

{22}    Initially, upon receiving the interlocutory appeal in 2018, the Court of Appeals certified this question to the Supreme Court. Declining certification, we ordered the Court of Appeals to issue an opinion on the matter. In a divided opinion, the Court of Appeals reversed the district court and held that the third-party indemnity claim was not assignable. *Leger v. Gerety*, 2019-NMCA-033, ¶ 56, 444 P.3d 1036. The Court of Appeals' majority first held that the MMA was ambiguous as to whether nonpatients' claims are assignable. *Id.* ¶ 26. In reaching this holding, the Court of Appeals' majority focused on the definitions section of the MMA, § 41-5-3 (1977). *Leger*, 2019-NMCA-033, ¶ 25. It determined that Subsection C of that provision, considered in light of other language in the MMA, suggests "equivalence" between the terms *malpractice claim* and *patient's claim*. *Leger*, 2019-NMCA-033, ¶ 25. However, because this evidence was not dispositive, the majority held that the statute was "ambiguous, and the question of the Legislature's intent concerning application of Section 41-5-12's prohibition against assignment [could not] be answered based on the MMA's *literal language*." *Leger*, 2019-NMCA-033, ¶ 26 (emphasis added) (internal quotation marks omitted).

{23}    The majority then turned to an analysis of the MMA's language and legislative purposes as they have been construed by three precedents: (1) *Wilschinsky*, 1989-NMSC-047, (2) *Duarte-Afara*, 2011-NMCA-112, and (3) *Baker*, 2013-NMSC-043. *Leger*, 2019-NMCA-033, ¶¶ 27-32. Relying on these cases, the Court of Appeals' majority concluded that the Legislature must have intended for the MMA's numerous requirements and restrictions (including the nonassignability provision) to apply to *all* claims governed by the MMA, including indemnity claims. *Id.* ¶ 40. The majority could "discern no reason why the Legislature would intend to subject indemnification claims to every MMA restriction except one." *Id.*

{24}    Judge Attrep, in dissent, challenged the majority's assertion that Section 41-5-3(C) rendered the statute ambiguous, reasoning that it did not establish equivalence between "malpractice claim" and "patient's claim" but instead defined *patient's claim* as one kind of *malpractice claim*. *Leger*, 2019-NMCA-033, ¶ 61 (Attrep, J., dissenting) ("The use of the words 'includes' and 'any' at the beginning of the [malpractice claim] definition indicates that 'malpractice claim' is wide sweeping, encompassing *all* causes of action against a health care provider based on acts of malpractice that proximately result in injury to the patient.") The dissent reasoned that because the statute supports a distinction between the terms, the majority should "give effect to the Legislature's choice of words—namely, that the non-assignability provision applies to 'patient's claims' and not to *all* 'malpractice claims' as the majority concludes." *Id.* ¶ 63 (Attrep, J., dissenting).

**{25}** Petitioner Leger petitioned this Court for certiorari, and we granted the petition. Based upon our analysis, we agree with the dissent.

## III.    STATUTORY CONSTRUCTION

**{26}** The issue presented requires us to engage in statutory construction, which calls for our review de novo. *State v. Almanzar*, 2014-NMSC-001, ¶ 9, 316 P.3d 183. In construing a statute, the Court's "primary goal is to ascertain and give effect to the intent of the Legislature." *State v. Nick R.*, 2009-NMSC-050, ¶ 11, 147 N.M. 182, 218 P.3d 868. In furtherance of this goal, "we examine the plain language of the statute as well as the context in which it was promulgated, including the history of the statute and the object and purpose the Legislature sought to accomplish." *Maes v. Audubon Indem. Ins. Grp.*, 2007-NMSC-046, ¶ 11, 142 N.M. 235, 164 P.3d 934.

### A.    The Plain Meaning of Section 41-5-12

**{27}** "The first and most obvious guide to statutory interpretation is the wording of the statutes themselves." *Dewitt v. Rent-a-Center, Inc.*, 2009-NMSC-032, ¶ 29, 146 N.M. 453, 212 P.3d 341. "We give the words of a statute their ordinary meaning in the absence of clear and express legislative intent to the contrary." *Fernandez v. Espanola Pub. Sch. Dist.*, 2005-NMSC-026, ¶ 3, 138 N.M. 283, 119 P.3d 163 (citation omitted). "Unless ambiguity exists, this Court must adhere to the plain meaning of the language." *State v. Maestas*, 2007-NMSC-001, ¶ 14, 140 N.M. 836, 149 P.3d 933. We "will not depart from the plain language of the statute unless it is necessary to resolve an ambiguity, correct a mistake or an absurdity that the Legislature could not have intended, or . . . deal with an irreconcilable conflict among statutory provisions." *Maestas v. Zager*, 2007-NMSC-003, ¶ 9, 141 N.M. 154, 152 P.3d 141 (internal quotation marks and citation omitted).

**{28}** Section 41-5-12 provides that "[a] patient's claim for compensation under the [MMA] is not assignable." Section 41-5-3(E) defines *patient* as "a natural person who received or should have received health care from a licensed health care provider, under a contract, express or implied." Read plainly, then, Sections 41-5-12 and 41-5-3(E) would appear to bar assignment only of "claim[s] for compensation" held by "natural person[s] who received or should have received health care from a licensed health care provider." Because Presbyterian is not a natural person who received or should have received health care, it is not a "patient" for purposes of the MMA, and Section 41-5-12 would not by its plain terms apply to Presbyterian's indemnity claim.

**{29}** Echoing the reasoning of the Court of Appeals' majority, Respondents acknowledge that we must initially look to the plain language of the statute but remind us of Justice Montgomery's words in *State ex rel. Helman v. Gallegos*:

> [T]he plain meaning rule['s] . . . beguiling simplicity may mask a host of reasons why a statute, apparently clear and unambiguous on its face, may for one reason or another give rise to legitimate (i.e., nonfrivolous) differences of opinion concerning the statute's meaning. In such a case, it

can rarely be said that the legislation is indeed free from all ambiguity and is crystal clear in its meaning.

1994-NMSC-023, ¶ 23, 117 N.M. 346, 871 P.2d 1352.

**{30}** Respondents suggest the plain language of Section 41-5-12 reveals itself to be ambiguous when considered in light of the MMA definition of "malpractice claim," § 41-5-3(C), which, they contend in conclusory fashion, renders the terms *malpractice claim* and *patient's claim* interchangeable. Section 41-5-3(C) states,

> "[M]alpractice claim" includes any cause of action arising in this state against a health care provider for medical treatment, lack of medical treatment or other claimed departure from accepted standards of health care which proximately results in injury to the patient, whether the patient's claim or cause of action sounds in tort or contract, and includes but is not limited to actions based on battery or wrongful death.

The Court of Appeals' majority concluded that

> the phrase 'whether the patient's claim or cause of action sounds in tort or contract' in Section 41-5-3(C) does suggest equivalence, and language used throughout the MMA reflects a statutory scheme addressing the liability of health care providers on claims arising in the first instance from 'injury to the patient' resulting from medical malpractice.

*Leger*, 2019-NMCA-033, ¶ 25. What Respondents' equivalence argument fails to address is just how plain and precise the language of the MMA actually is.

**{31}** Indeed, it is difficult to envision language more plain than that found in Section 41-5-12, which states simply, "[a] patient's claim for compensation under the [MMA] is not assignable." The word *patient* is defined by the MMA as "a natural person who received or should have received health care from a licensed health care provider," § 41-5-3(E), and the word *claim* is readily understood in ordinary usage as "[a]n interest or remedy recognized at law; the means by which a person can obtain a privilege, possession, or enjoyment of a right or thing; cause of action." *Claim*, *Black's Law Dictionary* 311-12 (11th ed. 2019). Therefore, a *patient's claim* is a cause of action held by a natural person who received or should have received health care from a licensed provider. Nothing in this definition contemplates inclusion of an indemnification claim.

**{32}** Further, the Legislature used the term *malpractice claim* throughout the MMA and could have used it in lieu of "patient's claim" in Section 41-5-12 had it intended the broader meaning. It chose otherwise. We cannot ignore this specific choice of words as an indication that the Legislature intended only that patients' claims, not all malpractice claims, be made unassignable.

**{33}** Finally, Respondents' proposed reading of Section 41-5-3(C)——which gives rise to a statutory conflict——is far from definitive. *See Leger*, 2019-NMCA-033, ¶ 26

(stating that, while the text may be read as establishing equivalence between *malpractice claim* and *patient's claim*, the statute is ambiguous). It is at least as reasonable to conclude that the clause "whether the patient's claim or cause of action sounds in tort or contract" from Section 41-5-3(C) is meant to qualify only the clause immediately preceding it, "or other claimed departure from accepted standards of health care which proximately results in injury to the patient," a reading made more likely by the fact that both clauses include the word *patient*. This reading of the definitional provision creates no conflict between Sections 41-5-3(C) and 41-5-12; *patient's claim* is simply a subset of *malpractice claims* and Section 41-5-12 applies only to the former. Prior authority instructs us to avoid finding conflict where a statute can be interpreted harmoniously, as it can in this instance. *See State v. Rivera*, 2004-NMSC-001, ¶ 13, 134 N.M. 768, 82 P.3d 939 ("[W]henever possible . . . we must read different legislative enactments as harmonious instead of as contradicting one another." (second alteration in original) (internal quotation marks and citation omitted)); *see also Cordova v. Taos Ski Valley, Inc.*, 1996-NMCA-009, ¶ 22, 121 N.M. 258, 910 P.2d 334 ("In analyzing a statute, we must attempt to achieve internal consistency and avoid making any portion of the statute superfluous.").

**{34}** In applying the plain meaning rule, "statutes are to be given effect as written and, where they are free from ambiguity, there is no room for construction." *Helman*, 1994-NMSC-023, ¶ 2 (internal quotation marks and citation omitted). When the plain meaning of statutory language is as straightforward as it is here, it is our obligation to uphold the statute as written.

> [I]f the meaning of a statute is truly clear—not vague, uncertain, ambiguous, or otherwise doubtful—it is of course the responsibility of the judiciary to apply the statute as written and not to second-guess the legislature's selection from among competing policies or adoption of one of perhaps several ways of effectuating a particular legislative objective.

*Id*. ¶ 22.

**{35}** We therefore conclude that the plain language of the MMA's nonassignability provision is clear and unambiguous and does not bar claims held by nonpatients, such as the indemnity cause of action at issue here. As an exercise in thoroughness, however, we next address the legislative purpose of the MMA and consider whether a plain meaning interpretation leads to an absurd or unreasonable result.

## B.     The Legislative Purpose Underlying the MMA

**{36}** The Legislature's purpose in enacting the MMA, as stated in Section 41-5-2, is "to promote the health and welfare of the people of New Mexico by making available professional liability insurance for health care providers in New Mexico."[2] This Court has

---

[2]We are aware of the 2021 amendments to the MMA, including the repeal of Section 41-5-2 which takes effect on January 1, 2022. On its date of publication, our opinion reflects the law in effect for the factual and procedural circumstances of this case.

on several occasions interpreted what the Legislature intended to accomplish in passing the MMA. "A major purpose of the [MMA] was to meet a perceived insurance crisis in New Mexico." *Baker*, 2013-NMSC-043, ¶ 16 (quoting *Wilschinsky*, 1989-NMSC-047, ¶ 26 (internal quotation marks omitted)). The MMA "provid[es] a framework for tort liability with which the insurance industry [can] operate . . . [that] restrict[s] and limit[s] plaintiffs' rights under the common law" through several procedures and measures, including "a limitation on full recovery for malpractice injury." *Wilschinsky*, 1989-NMSC-047, ¶ 21. The MMA "created a system that inspires widespread participation to ensure that patients would have adequate access to health care services and that they would have a process through which they can recover for any malpractice claims." *Baker*, 2013-NMSC-043, ¶ 20.

**{37}** Respondents contend that applying the plain meaning of Section 41-5-12 would lead to absurd results at odds with the legislative intent behind the MMA. First, Respondents assert that allowing for assignment of indemnification claims could result in double recovery for plaintiffs in contravention of the MMA's cap on damages, which sets limits on the per-occurrence recovery available to patients suing for malpractice. Section 41-5-6(A). Second, Respondents argue that interpreting the statute to allow for assignment of indemnity claims could enable a subclass of plaintiffs to circumvent the requirements of the MMA altogether. We are unpersuaded by these arguments and address each in turn.

### 1. Allowing for assignment of indemnification claims does not result in double recovery for plaintiffs

**{38}** Respondents argue that if we interpret Section 41-5-12 to allow for the assignment of indemnity claims, tort plaintiffs will be allowed to receive double recovery for their medical malpractice claims. Respondents assert that, because Leger recovered one hundred percent of liability damages in his settlement with Presbyterian, any additional recovery on the indemnity claim would be a second recovery. Respondents contend that because the MMA was enacted in part "to *decrease* the costs and limit the losses associated with a medical malpractice claim," the possibility of double recovery is a result absurd enough to warrant the Court's rejection of a plain meaning interpretation of Section 41-5-12.

**{39}** Petitioner responds that there is no double recovery concern here because the plaintiffs, standing in the shoes of the original indemnitee (Presbyterian), will recover no more than the indemnitee could have obtained from the indemnitor. That is, because Petitioner would not be permitted to recover any more from Respondents than could Presbyterian, any concern about increasing the costs of malpractice litigation and recovery is misplaced. We agree with Petitioner.

**{40}** The question of whether Petitioner will be able to recover twice on his tort claims as a consequence of the indemnity assignment begins with an analysis of whether the damages he might receive from the indemnity action are properly characterized as damages for negligence. *See generally Hale v. Basin Motor Co.*, 1990-NMSC-068, ¶ 20, 110 N.M. 314, 795 P.2d 1006 ("New Mexico does not allow *duplication of damages*

or *double recovery for injuries received*." (emphasis added)). Under the settlement with Presbyterian, Petitioner obtained as his sole recovery money damages and the assigned right to pursue Presbyterian's claim for indemnification against Respondents. The underlying malpractice complaint against Presbyterian alleged negligence by at least three doctors, including Respondent Gerety, and made general allegations of negligence against Presbyterian. In partial consideration for releasing his claims against Presbyterian and its employees and agents, Petitioner acquired a property interest in Presbyterian's indemnification claim against Respondents. *See* 6A C.J.S. *Assignments* § 42 (2021) ("An assignment is a commonly used method of transferring a cause of action. Thus, a chose in action, whether arising in tort or contract, is generally assignable, since a chose in action constitutes personal property." (footnotes omitted)). In short, in exchange for releasing his claims against Presbyterian, Petitioner received a sum of money and a property interest of some, as yet undetermined, value.

**{41}** In order to collect on the assigned indemnity claim, Petitioner must pursue and prevail in Presbyterian's cause of action against Respondents. Standing in the shoes of Presbyterian, Petitioner's status in the indemnification lawsuit is first and foremost as an indemnitee, not as a tort plaintiff. *See Emps.' Fire Ins. Co. v. Welch*, 1967-NMSC-248, ¶ 5, 78 N.M. 494, 433 P.2d 79 ("An assignee [of an indemnitee's] . . . cause of action stands in the same position as the [indemnitee].") Only if his efforts are successful will Petitioner's property right to indemnification result in an award of money damages. However, the damages recoverable in an indemnity action are not damages for personal injury but, rather, damages owing from one tortfeasor to another. Indemnification is an independent source of liability "separate and distinct from the underlying tort." *Duarte-Afara*, 2011-NMCA-112, ¶ 18. While "the gravamen of the [indemnification] claim is *predicated* upon the allegation of professional negligence," *id.* (emphasis added), it is not itself a claim of professional negligence.

**{42}** There are at least two other reasons why a plain language interpretation of Section 41-5-12 is not at odds with the legislative purpose of the MMA. First, the amount Petitioner may ultimately receive through the indemnity claim is limited by operation of the MMA, § 41-5-6, and by the common law, obviating concerns about increasing costs of recovery in medical malpractice actions. Because Respondents are qualified health care providers under the MMA, they cannot be personally liable for monetary damages or costs of future medical care in excess of the cap imposed by the MMA, Section 41-5-6(D). Moreover, the total per-occurrence liability for nonmedical and nonpunitive damages is capped at $600,000 by Section 41-5-6(A). Second, the maximum amount Petitioner can receive through indemnification is the amount Presbyterian actually paid Petitioner in its settlement agreement plus reasonable attorney's fees. *See* Restatement (Third) of Torts: Apportionment of Liability § 22(a) ("When two or more persons are or may be liable for the same harm and one of them discharges the liability of another in whole or in part by settlement or discharge of judgment, the person discharging the liability is entitled to recover indemnity in the amount paid to the plaintiff, plus reasonable legal expenses, if . . . the indemnitee . . . was not liable except vicariously for the tort of the indemnitor."). Because this is the same amount Presbyterian would be entitled to recover in a successful indemnity action

against Respondents, permitting the assignment of Presbyterian's indemnity claim to Petitioner will not increase the overall costs of malpractice litigation or recovery.

**{43}** Further, interpreting Section 41-5-12 to permit the assignment of indemnity actions may enhance the likelihood of settlement in medical malpractice actions, as it appears to have done in this case. While the full nature or extent of the liability faced by Presbyterian was never determined by a jury in the underlying action, because Presbyterian was not a qualified health care provider, it did not enjoy the protections of the MMA with respect to its own liability to Petitioner——either directly or vicariously for the actions of its employees. *See* § 41-5-5(C) ("A health care provider not qualifying under this section shall not have the benefit of any of the provisions of the [MMA] in the event of a malpractice claim against it."). In this context, the availability to Presbyterian of an additional inducement may have enhanced its inclination to settle the malpractice action with Petitioner. New Mexico policy favors the settlement of claims, which can reduce the costs of litigation and recovery. *See Sunnyland Farms, Inc. v. Cent. N.M. Elec. Coop., Inc.*, 2013-NMSC-017, ¶ 51, 301 P.3d 387 (noting that New Mexico generally has a policy of encouraging settlements).

**{44}** For the foregoing reasons, we conclude that allowing assignment of indemnity claims would not result in double recovery for the plaintiff in contravention of the legislative purposes of the MMA.

**2.    Interpreting the MMA to allow for assignment of indemnity claims does not create a subclass of claims that allows medical malpractice plaintiffs to circumvent the MMA**

**{45}** Respondents argue that interpreting Section 41-5-12 to prohibit only assignment of a patient's claim would "[t]ransform[] a defendant's or former defendant's claims into commodities that [could] be purchased by anyone . . . for any reason." In other words, Respondents are concerned that adopting a plain language reading of the nonassignability provision to permit assignment of third-party claims would create a market for trafficking those claims. Respondents urge the Court to prohibit assignment of MMA indemnity claims for the same reasons that the common law prohibits assignment of personal injury claims. *See Quality Chiropractic, PC v. Farmers Ins. Co. of Ariz.*, 2002-NMCA-080, ¶¶ 10-11, 132 N.M. 518, 51 P.3d 1172 (warning against "the intermeddling of . . . stranger[s] in the litigation of [others], for profit").

**{46}** Petitioner responds that indemnity claims are different from personal injury claims and that the policies against assignment of personal injury claims do not hold up when applied to indemnification claims. He contends that one of the primary reasons personal injury claims are not assignable at common law is to ensure that "strangers" to the litigation do not siphon off recovery that would otherwise go to the injured party. *See id.* ¶¶ 10-11. Petitioner maintains that in an indemnification claim, the indemnitee may only recover from the indemnitor the amount the indemnitee has paid to the plaintiff. For this reason, he argues, there is no reason to expect that assignment of an indemnification claim would lead to a reduced recovery for the plaintiff. We agree.

**{47}** While there is very little in the historical or legislative record explaining the provenance of nonassignability provisions in medical malpractice statutes,[3] we do know that prohibitions against the assignment of personal injury claims have a long history in New Mexico and elsewhere. *See Kandelin v. Lee Moor Contracting Co.*, 1933-NMSC-058, ¶ 37, 37 N.M. 479, 24 P.2d 731 ("As a general rule, a right of action for a tort purely personal, in the absence of statute, is not subject to assignment before judgment."); R.D. Hursh, *Assignability of Claim for Personal Injury or Death*, 40 A.L.R. 2d 500 § 3 (1955) ("It seems that few legal principles are as well settled, and as universally agreed upon, as the rule that the common law does not permit assignments of causes of action to recover for personal injuries."). Historically, all practices of champerty ("intermeddling of a stranger in the litigation of another, for profit") and maintenance ("financing of such intermeddling") were disfavored. *Quality Chiropractic*, 2002-NMCA-080, ¶ 10 (internal quotation marks and citation omitted). Trading in personal torts raises specific policy concerns, including whether such actions survive the injured person, whether such distinctly personal torts are properly advanced by others, and whether they exploit the particular vulnerability of injured persons. *See* Hursh, 40 A.L.R. 2d 500 § 4 (discussing prohibitions based on nonsurvivability of the assigned claim after death); *N. Chicago St. R.R. Co. v. Ackley*, 49 N.E. 222, 225-26 (Ill. 1897) (asking whether any court has "ever sanctioned a claim by an assignee to compensation for wounded feelings, injured reputation, or bodily pain, suffered by an assignor"); *Kimball Int'l, Inc. v. Northfield Metal Prods.*, 760 A.2d 794, 802 (N.J. Super. Ct. App. Div. 2000) ("The essential purpose of this prohibition is to prevent unscrupulous strangers to an occurrence from preying on the deprived circumstances of an injured person." (internal quotation marks and citation omitted)).

**{48}** Not surprisingly, then, while common law prohibitions against the assignment of property- and contract-based claims have eroded almost completely, the prohibition on assigning personal injury claims retains its force in many jurisdictions, including New Mexico. *See Quality Chiropractic*, 2002-NMCA-080, ¶¶ 32-33; *Wilson v. Berger Briggs Real Est. & Ins., Inc.*, 2021-NMCA-054, ¶ 8, ___ P.3d ___ (A-1-CA-38713, May 10, 2021) ("In New Mexico, personal injury claims are not assignable, yet our jurisprudence suggests commercial disputes are."), *cert. denied* (S-1-SC-38845, Oct. 20, 2021); *see also Parker v. Beasley*, 1936-NMSC-004, ¶ 10, 40 N.M. 68, 54 P.2d 687 ("The general

---

3Perhaps this is because such provisions were and remain uncommon. According to one survey, "52 states and territories passed remedial legislation in a two-year period beginning in 1975 and ending in 1976." Shirley Qual, *A Survey of Medical Malpractice Tort Reform*, 12 Wm. Mitchell L. Rev. 417, 419 n.8 (1986) (internal quotation marks and citation omitted). Yet only five codified nonassignability provisions: Indiana, Delaware, Nebraska, New Mexico, and the Virgin Islands. *See* Ind. Code Ann. § 34-18-16-3 (West 1998) ("A patient's claim for compensation under this article is not assignable."); Del. Code Ann. tit. 18, § 6863 (West 1976) ("A claim for compensation under this chapter is not assignable; provided, however, that rights of subrogation shall not be deemed to constitute assignment."); Neb. Rev. Stat. Ann. § 44-2826(3) (West 1976) ("A patient's claim for compensation under [the Nebraska Hospital——Medical Liability Act] shall not be assignable."); V.I. Code Ann. tit. 27, § 166c (West 1975) ("A patient's claim for compensation under this subchapter is not assignable."). Research on such provisions revealed only one case, which does not discuss its origins or legislative purpose. *See Royal Caribbean Cruises, Ltd. v. Abba*, 2016 WL 7637288 at *5 (V.I. 2016) (Mem. Op.) (finding an indemnification assignment not barred by a medical malpractice nonassignability provision because "the right of action on claims of implied indemnification and contribution inures to the indemnitee, not the patient").

rule now is that choses in action are assignable, the few exceptions are those for personal wrongs and contracts of a personal nature involving confidence, skill, and others of like nature.").

**{49}**     With this history in mind, the Legislature's decision to include a provision barring the assignment of patients' claims to compensation, while not barring the assignment of other kinds of malpractice claims, can hardly be said to be unreasonable. The Legislature may simply have intended to codify common law protections for injured persons. Courts from other jurisdictions have evinced a similar interest in upholding assignments of indemnity claims. *See Kimball*, 760 A. 2d at 803 ("[T]he public policy underlying the prohibition against the assignment of tort claims . . . is not implicated in [the defendant's] partial assignment to [the tort plaintiff], because [the indemnitee-defendant] manufacturer is not vulnerable to being taken advantage of by persons who traffic in lawsuits."); *see also Caglioti v. Dist. Hosp. Partners, L.P.*, 933 A.2d 800, 813 (D.C. 2007) (citing *Kimball*, 760 A.2d at 803, approvingly); *Bush v. Super. Ct. of Sacramento Cnty.*, 13 Cal. Rptr. 2d 382, 387 (Ct. App. 1992) (permitting assignment of an equitable indemnification claim as part of the settlement with a tort plaintiff who suffered a loss from the insurer's failure to settle in good faith). A classification that bears a logical relationship to a legitimate legislative purpose is not unreasonable. *See Cummings v. X-Ray Assocs. of N.M., P.C.*, 1996-NMSC-035, ¶¶ 40-42, 121 N.M. 821, 918 P.2d 1321 (holding that distinctions created within the MMA are reasonable if rationally related to legislative purposes of the MMA).

**{50}**     We are also not persuaded that, as an empirical matter, a plain reading of Section 41-5-12 limiting nonassignability to only patients' claims is likely to create a market for assigned indemnity claims. First, the MMA is forty-four years old, and this is the first time the Court has been asked whether such claims are assignable. It is likely that indemnity claims have been assigned to plaintiffs for decades, and Respondents do not point us to any realizations of the hypothetical parade of horribles they present in their answer brief.

**{51}**     Second, as we have explained, an indemnity claim arising from a claim of medical negligence against a qualified health care provider remains subject to the procedural requirements of the MMA. These requirements guard against the creation of a second-tier market of assigned indemnity claims by preventing an *end run* around the MMA's demands. For example, in an assigned indemnity claim, the assigned indemnitee would still be required to seek preliminary review of the underlying medical negligence claim by the medical review commission if the original indemnitee had not already presented the claim, and any recovery on the claim would be subject to the personal liability and nonmedical, nonpunitive damages caps of Sections 41-5-6 and 41-5-7(E). Finally, as the *Duarte-Afara* Court made explicit, an assigned indemnity claim would be subject to the statute of repose, § 41-5-13. *See* 2011-NMCA-112, ¶ 15.

**{52}**     For the foregoing reasons, we are not persuaded that adhering to the plain language of Section 41-5-12 would work an absurd result at odds with the legislative purpose of the MMA or create an unreasonable classification among malpractice claimants. To the contrary, while permitting the assignment of Presbyterian's indemnity

claim will not subject Respondents to double liability for the alleged negligence, a decision to bar the assignment might well have the effect of allowing negligent tortfeasors to evade liability——an outcome at odds with the balanced approach taken by the Legislature in creating the MMA. *See Baker*, 2013-NMSC-043, ¶ 20 ("By providing benefits and imposing burdens, the Legislature created a system that inspires widespread participation to ensure that patients would have adequate access to health care services and that they would have a process through which they can recover for any malpractice claims."); c*f. Emps.' Fire Ins. Co.*, 1967-NMSC-248, ¶ 9 ("It cannot be denied that had suit been brought against the present defendants and they had been found negligent in their individual capacities, they would have had to respond in damages. This is not changed by the statute in question. Defendants cannot be heard to complain that an additional burden is placed on them when the net effect is simply to say that they must respond for their individual negligent act, if any." (citation omitted)).

## IV.    RESPONSE TO DISSENT

{53}    The dissent's disagreement with the majority rests on two main contentions: (1) that the language in Section 41-5-12 is ambiguous, *dissent* ¶¶ 63-64, 70; and (2) that the majority's interpretation of Section 41-5-12 thwarts the legislative purposes of the MMA, *dissent* ¶ 62.

{54}    In support of the first point, the dissent argues that "a straightforward and grammatically acceptable reading" of Section 41-5-3(C) leads to the conclusion that the terms "malpractice claim" and "patient's claim" are "interchangeable and equivalent." *Dissent* ¶ 66. But the dissent's reading of Section 41-5-3(C) is hardly "straightforward." Resorting to an exception to the doctrine of the last antecedent, the dissent argues that the presence of a comma between the antecedent clause that ends with "injury to the patient" and the dependent clause that immediately follows, "whether the patient's claim or cause of action sounds in tort or contract," is "strong evidence" that the Legislature intended the dependent clause to characterize all of the antecedent clauses in Section 41-5-3(C)—i.e., all "malpractice claims"—and not only actions that cause "injury to the patient." *Dissent* ¶ 68. We find this reading of Section 41-5-3(C) too speculative to support a departure from the plain language of Section 41-5-12 especially where, as here, a much simpler construction, using the word "malpractice" instead of "patient's" in the dependent clause, would have accomplished the same end. Resting a conclusion that Section 41-5-12 is ambiguous on what the dissent admits is a doubtful construction of a separate provision of the MMA risks turning the cautionary language expressed in *Helman* into a rejection of the plain meaning rule itself. We do not believe this is what *Helman* instructs and it is not an approach we are prepared to endorse.

{55}    Second, the dissent argues that our decision today "effectively endorses the litigative gamesmanship in the proceedings below[.]" *Dissent* ¶ 62. We disagree. To the extent that there was "litigative gamesmanship" in evidence in the proceedings below (a fact we do not concede), it was in no way attributable to the *assignment* of the indemnity claim, much less our construal of Section 41-5-12, but rather to the bifurcation of the action and the stay of third-party discovery. These were decisions taken by the district court well in advance of the assignment, on motions vigorously contested by

Presbyterian. For reasons the dissent does not explore, *dissent* ¶ 86, Respondents did not oppose bifurcation and chose not to observe discovery in the underlying action. While these tactical decisions may prove, in hindsight, to be consequential, Respondents now suffer no disadvantage in the third-party action that they would not have suffered had the claim remained in Presbyterian's hands. Moreover, while the dissent expresses great concern that Respondents were required to respond to Petitioner's motion for partial summary judgment prior to undertaking full discovery in the third-party action, *dissent* ¶¶ 87-88, its opinion fails to note that the district court denied Petitioner's motion precisely *because* "defendants did not participate in the underlying tort claim."

{56}   Finally, we disagree with the dissent's assertion that our interpretation of Section 41-5-12 conflicts with the Legislature's intention that the MMA "apply broadly to all claims that seek recovery for a qualified health provider's malpractice," *dissent* ¶ 75, as evidenced by recent amendments to the MMA. For reasons that we have explained, we do not agree that an action for equitable indemnification is such a claim. Paragraphs 39-40, *supra*. We also note that, notwithstanding the significant changes the Legislature recently made to the MMA, it chose not to make any changes to Section 41-5-12, nor to include any new provision regarding indemnity claims. *See* §§ 41-5-1 to -29.

{57}   Our sole task in this case is to give effect to the Legislature's intention. *Nick R.*, 2009-NMSC-050, ¶ 11. In so doing, we must be attentive not only to what the Legislature has said, but what it has chosen not to say. *See State v. Trujillo,* 2009-NMSC-012, ¶ 11, 146 N.M., 206 P.3d 125 ("We will not read into a statute any words that are not there, particularly when the statute is complete and makes sense as written.") Section 41-5-12 contains no language barring assignment of an indemnity claim and we find no justification for judicially inserting such language.

## V.   CONCLUSION

{58}   We conclude that the plain meaning of Section 41-5-12 is specific, clear, and unambiguous in restricting only patients' claims from assignment and is consistent with the legislative purposes of the MMA. For these reasons, we reverse the Court of Appeals and remand for proceedings consistent with this opinion.

{59}   IT IS SO ORDERED.

**BRIANA H. ZAMORA, Justice**

**WE CONCUR:**

**JANE C. LEVY, Judge**
**Sitting by designation**

**KAREN L. TOWNSEND, Judge**
**Sitting by designation**

**JUDITH K. NAKAMURA, Justice, retired, sitting by designation (concurring in dissent)**

**JAMES M. HUDSON, Judge, sitting by designation (dissenting)**

**HUDSON, Judge, sitting by designation (dissenting).**

## I.      INTRODUCTION

**{60}**    The majority rightly concludes that Presbyterian's claim for equitable indemnification or contribution against Respondents is a "malpractice claim" subject to the requirements of the MMA. *Maj. op.* ¶ 17; *See Duarte-Afara,* 2011-NMCA-112, ¶ 15. The only point of contention, dispositive to the question presented, is whether Presbyterian's claim is also a "patient's claim for compensation under the [MMA]," § 41-5-12, and thus not assignable under Section 41-5-12. The majority holds that Section 41-5-12 does not apply to Presbyterian's claim.[4] I disagree.

**{61}**    The majority reasons that the word "patient," as used in Section 41-5-12, clearly evinces a legislative intent to limit nonassignability to malpractice claims directly asserted by "a natural person who received or should have received health care from a licensed health care provider, under a contract, express or implied," § 41-5-3(E), and to permit assignment of malpractice claims asserted by everyone else. *Maj. op.* ¶¶ 28, 35. In doing so, the majority engages in an unduly surgical application of the plain meaning rule and ultimately misconstrues Section 41-5-12 by "elevat[ing] form over substance," *Duarte-Afara*, 2011-NMCA-112, ¶ 16, frustrates the purpose of the Act by permitting malpractice claimants to achieve an "'end run around the MMA,'" *Baker*, 2013-NMSC-043, ¶ 35, and creates "an unreasonable classification" among otherwise similarly situated malpractice claimants. *Wilschinsky*, 1989-NMSC-047, ¶ 26.

**{62}**    Neither the MMA's purpose nor the legislative intent underlying Section 41-5-12 supports the distinction between a patient's and a nonpatient's malpractice claim that the majority advances today. Troubling also, the majority's opinion effectively endorses the litigative gamesmanship exhibited in the proceedings below, thereby allowing future malpractice claimants to subvert the procedural safeguards provided by the MMA, to obtain a double recovery in excess of the MMA's per-occurrence recovery limits, § 41-5-6(A), and to frustrate the purposes and protections of the Act. Convinced that the Legislature could not have intended such an unjust and contradictory result, I respectfully dissent.

## II.     DISCUSSION

---

4The Court of Appeals did not reach the question of whether the common law would prohibit assignment of Presbyterian's claim. *Leger,* 2019-NMCA-033, ¶ 2 ("Our statutory construction analysis is dispositive of this appeal, regardless of how a claim not covered by the MMA would be treated under the common law."). Thus, this question was not presented to the Court, and neither the majority nor the dissent addresses it.

**{63}** The parameters and rules of statutory construction are often stated and well understood. As this Court recently explained in *Lujan Grisham v. Reeb*:

> We review questions of statutory interpretation de novo. In construing the language of a statute, our goal and guiding principle is to give effect to the intent of the Legislature. In determining intent we look to the language used. We generally give the statutory language its ordinary and plain meaning unless the Legislature indicates a different interpretation is necessary. However, we will not be bound by a literal interpretation of the words if such strict interpretation would defeat the intended object of the legislature. Thus, where statutory language is doubtful, ambiguous, or an adherence to the literal use of the words would lead to injustice, absurdity or contradiction, we construe a statute according to its obvious spirit or reason. In ascertaining a statute's spirit or reason, we consider its history and background and read the provisions at issue in the context of the statute as a whole, including its purposes and consequences.

2021-NMSC-006, ¶ 12, 480 P.3d 852 (brackets, internal quotation marks and citations omitted). At issue is whether Section 41-5-12 is ambiguous or whether adherence to the plain meaning rule would result in "injustice, absurdity, or contradiction." *See Lujan Grisham*, 2021-NMSC-006, ¶ 12 (internal quotation marks and citation omitted). The ineluctable conclusion is that Section 41-5-12 is ambiguous, and, in light of the MMA's purpose, justice demands that the statute be construed to prohibit assignment of malpractice claims, including Presbyterian's claim for indemnification or contribution against Respondents.

### A.   The MMA Prohibits Assignment of Presbyterian's Claim

**{64}** The Court is asked to construe the meaning of Section 41-5-12, which provides that "[a] patient's claim for compensation under the [MMA] is not assignable." We find ourselves having to "pass between Scylla and Charybdis" in construing this seemingly simple statutory language. *State ex rel. Helman*, 1994-NMSC-023, ¶ 26 (internal quotation marks and citation omitted). The majority concludes that the phrase "patient's claim" plainly refers to the technical definition accorded to the term "patient." Section 41-5-3(E); s*ee maj. op.* ¶¶ 28, 35. I submit that the majority's construction places too much emphasis on a single word ("patient") and fails to consider how that word is used in light of its overall semantic and statutory context. The simple fact is that reasonable minds can and do differ on the meaning of Section 41-5-12, and our analysis must reach beyond the literal and mechanical operation of a single word.

### 1.   "A patient's claim for compensation" is a "malpractice claim"

**{65}** In contrast with the majority's narrow analysis, I conclude that the plain language of Section 41-5-12 does not clearly and unambiguously prohibit assignment of claims asserted only by "a natural person who received or should have received health care." Section 41-5-3(E). Rather, Section 41-5-12 prohibits assignment of a "patient's claim *for compensation under the* [*MMA*]" (emphasis added). There is only one type of "patient's

claim for compensation" specifically contemplated "under the MMA," § 41-5-12, and that is a "malpractice claim," § 41-5-3(C). *See also Baker*, 2013-NMSC-043, ¶ 34 ("The MMA only covers claims for medical malpractice."). That being so, Section 41-5-12 prohibits assignment of Presbyterian's malpractice claim for indemnification or contribution to Petitioner.

**{66}** It is given that the precise phrase at issue here (a "patient's claim for compensation under the [MMA]"), is not specifically defined in the Act. Yet, through a close reading, one must logically infer that the language at issue merely provides an alternative method of describing a "malpractice claim," § 41-5-3(C), with no substantive change to the meaning of either term intended. The MMA uses the phrase "patient's claim" only twice: first, in the nonassignability provision here under review, § 41-5-12, and second, in the very definition of the term "malpractice claim," § 41-5-3(C). Section 41-5-3(C) provides that a

> "malpractice claim" includes *any cause of action* arising in this state against a health care provider for medical treatment, lack of medical treatment or other claimed departure from accepted standards of health care which proximately results in injury to the patient, *whether the patient's claim or cause of action* sounds in tort or contract, and includes but is not limited to actions based on battery or wrongful death; "malpractice claim" does not include a cause of action arising out of the driving, flying, or nonmedical acts involved in the operation, use or maintenance of a vehicular or aircraft ambulance.

(Emphasis added.) Section 41-5-3(C) does not clearly distinguish between a "patient's claim" and a "malpractice claim." Rather, a straightforward and grammatically acceptable reading suggests that the qualifying phrase beginning with "whether the patient's claim . . ." simply elaborates upon the antecedent definition of a "malpractice claim" as "any cause of action . . . ." *Id.* More particularly, the qualifying phrase elaborates on the core definition of a "malpractice claim" by emphasizing that this defined term indeed broadly extends to any cause of action seeking damages for injuries proximately caused by a qualified health provider's treatment of a patient, regardless of the theory of liability or recovery asserted (e.g., tort, contract, assault, or battery). In other words, a straightforward reading of Section 41-5-3(C) suggests that the terms "malpractice claim" and "patient's claim" are interchangeable and equivalent. No language in either Section 41-5-3(C) or Section 41-5-12 suggests that the phrase "patient's claim" applies only to a distinct subset of malpractice claimants.

**{67}** I thus disagree with the majority's reading that the qualifying phrase in Section 41-5-3(C) ("whether the patient's claim or cause of action . . .") modifies only the immediately antecedent phrase ("or other claimed departure from accepted standards of health care which proximately results in injury to the patient"), *maj. op.* ¶ 33. That immediately antecedent phrase is clearly but one part of a three-part series ("medical treatment, lack of medical treatment or other claimed departure from accepted standards of health care"), each of which describes a different type of medical malpractice (i.e., (1) "medical treatment . . . which proximately results in injury to the

patient," (2) "lack of medical treatment . . . which proximately results in injury to the patient," (3) "or other claimed departure from accepted standards of health care which proximately results in injury to the patient."). *See* § 41-5-3(C). Limiting the qualifying phrase ("whether the patient's claim . . .") to only modify the last phrase in this three-part series renders the preceding two phrases in that series absurd. *See* § 41-5-3(C). For example, if this three-part series was to be divided so that the phrase "proximately results in injury to the patient" only modifies "or other claimed departure from accepted standards of health care," then a "malpractice claim" would include a cause of action "for medical treatment" or "lack of medical treatment," irrespective of whether such treatment or lack of treatment "proximately result[ed] in injury to the patient." *See* § 41-5-3(C). Claimants could sue qualifying health care providers simply because they were or were not treated by the provider. The majority's proposed construction of Section 41-5-3(C) thus leads to absurd results.

{68}    The majority's reading of Section 41-5-3(C) also contravenes a well-accepted exception to the last antecedent rule, which recognizes that "[e]vidence that a qualifying phrase is supposed to apply to all antecedents[,] instead of only to the immediately preceding one[,] may be found in the fact that it is separated from the antecedent by a comma." *Lucero v. Northland Ins. Co.,* 2015-NMSC-011, ¶ 19 n.2, 346 P.3d 1154 (first alteration in original) (internal quotation marks and citation omitted)); *Kevin J. v. Sager,* 2000-NMCA-012, ¶ 11, 128 N.M. 794, 999 P.2d 1026 ("[A] comma separating the qualifying phrase from the antecedents is strong evidence the qualifying phrase applies to all antecedents, not solely the last antecedent."). The comma separating the qualifying phrase ("whether a patient's claim . . .") from the antecedent independent clause suggests that we should not amputate this sentence at its joint, as the majority does. Rather, we should appropriately read the qualifying phrase as modifying all of the antecedents in the preceding independent clause. Again, these antecedents make up the very definition of a "malpractice claim."

{69}    In short, a straightforward, harmonious, and logical reading reveals that the term "patient's claim," § 41-5-3(C) and § 41-5-12, is simply a different iteration of the core term, "malpractice claim," § 41-5-3(C). As we noted in *Regents of University of New Mexico v. New Mexico Federation of Teachers*, the Legislature may use "two slightly different terms to express a single idea," 1998-NMSC-020, ¶ 42, 125 N.M. 401, 962 P.2d 1236, and we will interpret these slightly different terms as equivalent in order to give effect to the Legislature's intent. *Id.* ¶ 40. As the *Regents of University of New Mexico* Court explained,

> it is more logical to conclude that, when a term, comprised of more than one word, is expressly defined by a statute, and a shortened form of this term appears elsewhere in the statute in context similar to the use of the long form, and further, when the statute includes no separate definition for this shortened form, the court should presume that the two terms have one-and-the-same definition.

*Id.* Under a similar approach, the mere presence of the word "patient" in Section 41-5-12, without more, would not clearly establish that the statute applies only to a

malpractice claim directly asserted by or on behalf of a patient. Rather, it is more logical to conclude that the undefined term "patient's claim for compensation under the [MMA]," § 41-5-12, or "patient's claim," § 41-5-3(C), is meant to provide an alternative method of describing the defined term "malpractice claim," § 41-5-3(C), even though the undefined terms rely on slightly different phraseology or form. Section 41-5-12 is thus another instance in the MMA where "the Legislature was simply imprecise with its language." *Baker*, 2013-NMSC-043, ¶ 30.

## 2. Nonassignability of malpractice claims promotes legislative intent

{70} I readily acknowledge that others may disagree with the above construction. But, considering the existence of this "legitimate (i.e., nonfrivolous) difference[] of opinion concerning [Section 41-5-12's] meaning," it can hardly "be said that the legislation is indeed free from all ambiguity and is crystal clear in its meaning." *State ex rel. Helman*, 1994-NMSC-023, ¶ 23. The majority's reliance on the purported plain meaning of the statute is therefore misplaced.

{71} The majority acknowledges that this Court's decisions have often rejected a literal or mechanical approach to statutory construction, at one point even quoting Justice Montgomery's warning to avoid being misled by the "beguiling simplicity" of the plain language rule. *Maj. op.* ¶ 29 (internal quotation marks and citation omitted). Yet the majority ultimately declines to follow Justice Montgomery's sage advice, suggesting instead that the language of Section 41-5-12 is "plain and precise." *Maj. op.* ¶ 30. Respectfully, this assertion is plainly incorrect. The language of Section 41-5-12 is ambiguous, as reasonable minds can and do differ on its meaning. After all, three well-regarded jurists on the Court of Appeals legitimately disagreed about the meaning of Section 41-5-12 in a closely divided panel. *Leger*, 2019-NMCA-033. And this legitimate disagreement is confirmed by this dissent.

{72} Justice Montgomery's counsel is therefore particularly pertinent, as even though the language of Section 41-5-12 "may appear absolutely clear and certain to the point of mathematical precision, lurking in another part of the [MMA], or even in the same section . . . [there are] one or more provisions giving rise to genuine uncertainty as to what the legislature was trying to accomplish." *State ex rel. Helman*, 1994-NMSC-023, ¶ 23. This Court's prior opinions construing the MMA have largely followed the *Helman* Court's purpose-driven approach to statutory construction, noting ambiguity in various portions of the Act's language. *See, e.g.*, *Baker*, 2013-NMSC-043, ¶ 15 ("In examining the provisions of the MMA, we adhere to Justice Montgomery's wise words of caution in applying the plain meaning rule, acknowledging that ambiguity may be lurking in even seemingly plain words if they conflict with the overall legislative intent"); *Cummings*, 1996-NMSC-035, ¶ 45 (construing the MMA's statute of repose, § 41-5-13, and noting that the plain meaning rule "does not require a mechanical, literal interpretation of the statutory language"). It is especially incongruous to step away from that consistent method of analysis, as we are asked to analyze what is essentially another parameter of the same type of claim that was at issue in those prior cases. Consistent with this Court's precedent, I thus submit that "the essence of [our] judicial responsibility" in construing Section 41-5-12 is "to search for and effectuate the legislative intent—the

purpose or object—underlying the statute." *State ex rel. Helman*, 1994-NMSC-023, ¶ 23.

**{73}** Yet, the majority maintains that the word "patient" plainly expresses a Legislative intent to limit Section 41-5-12 to a subset of malpractice claims directly asserted by "a natural person who received or should have received health care," § 41-5-3(E), and to distinguish that class of malpractice claimants from all others for purposes of assignability. Section 41-5-12's use of the word "patient" provides some textual basis for this proposition. But, if the Legislature intended thereby to distinguish malpractice claims asserted by a patient from malpractice claims asserted by a nonpatient, then the Legislature can hardly be said to have evinced this intent with "mathematical precision." *State ex rel. Helman*, 1994-NMSC-023, ¶ 23.

**{74}** For example, while the majority emphasizes that the Legislature uses the term "malpractice claim" throughout the Act, *maj. op.* ¶ 32, significantly, the Legislature does not consistently invoke that term in describing the types of claims contemplated. Rather, these claims are variously described as a "malpractice claim for bodily injury or death," § 41-5-4; as recovery "for or arising from any injury or death to a patient as a result of malpractice," § 41-5-6(A); as a "claim for malpractice arising out of an act of malpractice," § 41-5-13; or as a "malpractice action," § 41-5-15(A). As the Court of Appeals' majority aptly noted, the "language used throughout the MMA reflects a statutory scheme addressing the liability of health care providers on claims arising in the first instance from 'injury to the patient' resulting from medical malpractice." *Leger,* 2019-NMCA-033*,* ¶ 25 (citation omitted).

**{75}** Recent amendments to the MMA enacted during the pendency of this appeal support the Court of Appeals' characterization, demonstrating that the Legislature intends the MMA to apply broadly to all claims that seek recovery for a qualified health provider's malpractice. *See, e.g.*, § 41-5-6(B)-(G) (1992, as amended through 2021 (effective Jan. 1, 2022)) ("The aggregate dollar amount includes payment to any person for any number of loss of consortium claims or other claims per occurrence that arise solely because of the injuries or death of the patient"); § 41-5-15(A) (1976, as amended through 2021 (effective Jan. 1, 2022)) ("No malpractice action may be filed in any court against a qualifying independent provider *or the independent provider's employer, master or principal based on a theory of respondeat superior or any other derivative theory of recovery* . . . ." (emphasis added)). Section 41-5-12 must be construed to give proper effect to the intended broad application of the Act.

**{76}** Our precedent likewise supports a broad construction to the intended scope of the Act, as New Mexico courts have construed the term "malpractice claim" to encompass all claims premised upon an allegation of a qualified health care provider's medical malpractice, including the indemnification claim at issue here. *Maj. op.* ¶ 17; *Wilschinksy,* 1989-NMSC-047, ¶¶ 26, 27; *Duarte-Afara*, 2011-NMCA-112, ¶ 15.

**{77}** In *Wilschinsky,* this Court held that a nonpatient's claim against a qualified health provider is a "malpractice claim" subject to the requirements of the MMA whenever "the gravamen of the [claim] is predicated upon the allegation of professional negligence by

a practicing physician." *Wilschinsky*, 1989-NMSC-047, ¶ 27. There, the Court acknowledged that this holding was not supported "[u]nder principles of narrow construction" because the definition of "malpractice claim," § 41-5-3(C), did not expressly contemplate claims asserted by a nonpatient. *Wilschinsky*, 1989-NMSC-047, ¶ 24. But the Court nonetheless concluded that equal treatment between a patient's and a nonpatient's malpractice claim promoted the Legislature's intent and the MMA's overall purpose. *Id.* ¶¶ 26-27 ("A major purpose of the [MMA] was to meet a perceived insurance crisis and to regulate the tort liability of medical professionals for acts of medical malpractice. When we find, as we do here, a clash between the intent of the legislature and its own definitional section, we seek to harmonize the two.").

{78}    Similarly, in *Duarte-Afara,* our Court of Appeals concluded that a claim for indemnification arising from a qualified health provider's malpractice is a "malpractice claim" subject to the requirements of the MMA. 2011-NMCA-112, ¶ 15. The Court reached this conclusion "in part, so as to carry out the policy goals the Legislature intended by enacting the MMA." *Id.* ¶ 16. "Our Legislature intended to define the term 'malpractice claim' in the MMA broadly." *Id.* ¶ 19 (citing *Wilschinsky*, 1989-NMSC-047, ¶ 26). The Court acknowledged that a claim for indemnification "is separate and distinct from the underlying tort," but concluded that the "gravamen of the [indemnification] claim is predicated upon the allegation of professional negligence" and thus subject to the requirements of the Act. *Id.* ¶ 18.

{79}    Based on that holding, the majority recognizes that Presbyterian's claim is a "malpractice claim" under the MMA. *Maj. op.* ¶ 17. And rightly so. The gravamen of Presbyterian's third-party claim clearly is predicated on allegations of Respondent Gerety's malpractice. *See Wilschinsky*, 1989-NMSC-047, ¶ 27. Presbyterian's claim, if sounding in contribution, is predicated on an allegation of malpractice in seeking "proportionate allocation of the burden among tortfeasors who are [jointly and severally] liable." *Rio Grande Gas Co. v. Stahmann Farms, Inc.*, 1969-NMSC-089, ¶ 6, 80 N.M. 432, 457 P.2d 364; *see also* NMSA 1978, §§ 41-3-1, -2(D) (1947, as amended through 1987) (providing for right of contribution between joint and several tortfeasors); NMSA 1978, § 41-3A-1 (1987) (abolishing joint and several liability except in limited situations, such as those involving vicarious liability). If sounding in indemnification, that claim is predicated on an allegation of malpractice in seeking recovery for payments made solely because of Presbyterian's vicarious liability for Respondent Gerety's malpractice. *See, e.g.*, *Safeway, Inc.*, 2016-NMSC-009, ¶¶ 28-33 (limiting application of traditional indemnification "to situations of vicarious [liability] and derivative liability situations where the indemnitee is not actively negligent"); *see also In re Consol. Vista Hills Retaining Wall Litig.*, 1995-NMSC-020, ¶¶ 32-41, 119 N.M. 542, 893 P.2d 438 (adopting proportional indemnification in circumstances, not present here, where comparative negligence, contribution, and/or traditional indemnification are unavailable, so that New Mexico "now [has] a system in which, in almost every instance, liability among concurrent tortfeasors will be apportioned according to fault, regardless of the plaintiff's choice of remedy")*.* Thus, *Duarte-Afara* correctly held that claims for indemnification and contribution that seek recovery from a qualified health provider for amounts paid for the qualified provider's medical malpractice fall within the intended scope of the MMA. 2011-NMCA-112, ¶ 18.

**{80}** Although the majority nominally reaffirms *Duarte-Afara*, the majority refuses to take the next logical and necessary step in extending that precedent to the question presented. Instead, the majority's holding effectively undermines the precedential effect of *Wilschinsky* and *Duarte-Afara*, as a nonpatient's claim against a qualified health provider deriving from an alleged act of malpractice will now be subject to all of the MMA's requirements, save one: nonassignability under Section 41-5-12. *See Leger*, 2019-NMCA-033, ¶ 40 ("[W]e can discern no reason why the Legislature would intend to subject indemnification claims to every MMA restriction except one."). In contrast to the majority, I conclude that *Wilschinsky*'s and *Duarte-Afara*'s persuasive reasoning must be followed by recognizing that Presbyterian's malpractice claim is not assignable under Section 41-5-12. *See, e.g.*, NMSA 1978, § 12-2A-20(B)(2) (1997) (identifying "a judicial construction of the same or similar statute or rule of this or another state" as an aid to statutory construction). Both precedents recognize that a nonpatient seeking recovery for a qualified health provider's malpractice should be required to comply with the provisions of the MMA, even if those nonpatient's claims are not strictly contemplated under the statutory language. Similarly, Section 41-5-12 must be construed consistently with an intent to disallow the assignment of a nonpatient's malpractice claim, including Presbyterian's claim for indemnification or contribution as at issue here.

## B. Permitting Assignment Would Frustrate the Purpose of the MMA

**{81}** I likewise find little support for the majority's assertion that its "plain language" reading of Section 41-5-12 does not contravene the MMA's purpose. *See maj. op.* ¶ 37. To the contrary, the nonassignability of malpractice claims is essential to effectuate the Act's purpose.

**{82}** "The purpose of the [MMA] is to promote the health and welfare of the people of New Mexico by making available professional liability insurance for health care providers in New Mexico." Section 41-5-2. The MMA was promulgated "in order to meet an insurance crisis, to promote health care in New Mexico by providing a framework for tort liability with which the insurance industry could operate." *Wilschinsky*, 1989-NMSC-047, ¶ 21. "Through several procedural measures and by establishing a limitation on full recovery for malpractice injury, the Act restricted and limited plaintiffs' rights under the common law." *Id.* This Court has described the MMA as "a quid pro quo, whereby qualified health care providers are afforded certain legal protections only if they take financial action in anticipation of medical negligence lawsuits." *Siebert*, 2021-NMSC-016, ¶ 5. More specifically, the MMA establishes several procedural benefits that are "intended to change how the courts facilitate and administer remedies when a plaintiff brings a medical malpractice action against a qualified health care provider under the MMA." *Id.* ¶ 27. "By providing benefits and imposing burdens, the Legislature created a system that inspires widespread participation to ensure that patients would have adequate access to health care services and that they would have a process through which they can recover for any malpractice claims." *Baker*, 2013-NMSC-043, ¶ 20.

**{83}** In this matter of first impression, the Court considers yet another one of the MMA's procedural benefits: nonassignability. *See* § 41-5-12. The majority offers two

policy-based rationales for its conclusion that free assignability of Presbyterian's indemnification claim would not contravene the MMA's purpose: first, that assignment would not result in Petitioner's double recovery, *maj. op.* ¶¶ 38-44, and second, that free assignability would not necessarily lead to the traditionally recognized evils of champerty and maintenance, *maj. op.* ¶¶ 45-52. The majority misses the mark in both respects. The purpose of Section 41-5-12 is not only to prevent double recovery or the trafficking of malpractice claims, but also to preserve the recovery limits and other safeguards provided by the Act.

## 1.      Nonassignability is a key procedural benefit of the MMA

**{84}**    In contrast to the majority, I conclude that nonassignability of malpractice claims is a key procedural benefit provided to health providers who assume the burdens of qualifying under the Act. Like the MMA's statute of repose, § 41-5-13, nonassignability streamlines malpractice litigation by ensuring that all relevant parties are present in the underlying proceedings and thus "enables the parties to prove the material facts while they were reasonably fresh and before such proof has become stale, memories have dimmed, or material evidence has been entirely lost." *Moncor Tr. Co. ex rel. Flynn v. Feil*, 1987-NMCA-015, ¶ 11, 105 N.M. 444, 733 P.2d 1327. And, like the statute of repose, nonassignability of malpractice claims is a rational way to support the Act's overall purpose. *Cf. Cummings*, 1996-NMSC-035, ¶ 38 (rejecting a due process challenge to the MMA statute of repose because "[c]laims could arise long after memories have faded, *parties become unavailable*, and evidence is lost" (emphasis added)).

**{85}**    Indeed, Section 41-5-12's benefits are aptly illustrated by the procedural history of the litigation currently on appeal, which demonstrates that Respondents have been prejudiced by the assignment of Presbyterian's malpractice claim. The underlying malpractice action arises from the care and treatment of Patient Michael Thoemke. The majority's recitation of the factual allegations reveals that the malpractice claims against Presbyterian and Respondents are complex and intertwined, as Michael died while under the concurrent care of these providers. *Maj. op.* ¶¶ 7-8. Yet, Petitioner saw fit to sue only Presbyterian, electing to recover for the alleged malpractice of Respondent Gerety under a derivative theory of vicarious liability. By doing so, Petitioner bypassed review of his allegations of medical malpractice against Respondent Gerety by a panel of the New Mexico medical review commission, as provided for by Sections 41-5-15 to -20 (1976). Instead, Presbyterian complied with the MMA's panel review requirements and timely filed a third-party complaint for indemnification and/or contribution against Respondents due to Petitioner's allegations of its vicarious liability.

**{86}**    Shortly after, Petitioner moved to bifurcate and stay Presbyterian's third-party action, asserting that he had "no interest in the outcome" of the indemnification claim. Petitioner also moved for a protective order from any discovery propounded by Respondents, asserting that such discovery would "cause [Petitioner] annoyance and undue burden and expense." Respondents did not oppose the motion to bifurcate and stay, so long as Presbyterian could not invoke collateral estoppel on the issues. Respondents, however, asked the district court to deny the motion for protective order

so that they could actively participate in discovery. The district court granted both of Petitioner's motions, effectively foreclosing Respondents from actively participating in the ongoing discovery process.[5]

**{87}** Over the next several years, Petitioner and Presbyterian engaged in extensive discovery and motion practice, eventually reaching a full and final settlement on the eve of trial. In partial consideration of that settlement, Presbyterian assigned to Petitioner its indemnification claim. The district court allowed Petitioner to amend the third-party complaint to reflect that assignment and lifted the stay. A few weeks after Respondents answered this amended complaint, Petitioner moved for partial summary judgment on the issue of Respondent Gerety's medical malpractice, asking the district court to find that Respondent Gerety deviated from the standard of care in treating Michael. In service of that motion, Petitioner relied upon depositions, exhibits, and other information that he had uncovered during discovery conducted during the preceding litigation.

**{88}** Thus, contrary to notions of fairness inherent in litigation, Petitioner first prevented Respondents from participating in discovery and then sought to foreclose Respondents from mounting any meaningful defense to the malpractice claim by filing a premature dispositive motion. The prejudice to Respondents in responding to this motion was palpable. After only a few weeks of their active participation in the suit, Respondents were made to answer a potentially dispositive motion on the issue of Respondent Gerety's alleged medical negligence. Petitioner, on the other hand, drew upon years of active discovery to support his allegations. This disparity is unsettling. *Cf. Sun Country Sav. Bank v. McDowell*, 1989-NMSC-043, ¶ 27, 108 N.M. 528, 775 P.2d 730 ("[A] court should not grant summary judgment before a party has completed discovery, particularly when further factual resolution is essential to determine the central legal issues involved or the facts before the court are insufficiently developed" (citations omitted)).

**{89}** Of course, some of the prejudice to Respondents in responding to this motion was due to the bifurcation and stay. Yet the prejudice also arises as a direct result of the assignment of Presbyterian's malpractice claim. The assignment in essence created the conditions that allowed Petitioner to file a prejudicial dispositive motion against Respondents. Petitioner's tactics of, first, excluding Respondents because of Petitioner's stated lack of "interest" in the indemnification claim, second, acquiring of an interest in that claim, and third, attempting to capitalize upon a disadvantage *which*

---

[5]Petitioner's argument that Respondents could have nevertheless participated in discovery after the district court granted these motions both belies the relief sought and obtained by Petitioner and misapprehends the nature of a stay. Even the district court acknowledged that Respondents were prohibited from actively participating in discovery as a result of the stay, explaining that Respondents would not be estopped from defending against the allegations of medical malpractice against Respondent Gerety upon resumption of Presbyterian's third-party action because "as a result of the severance and stay . . . [Respondents are] not able to participate and to defend against those claims." Moreover, there is a fundamental qualitative difference between merely observing discovery conducted by others and actively participating in discovery as an advocate for the interests of a client.

*Petitioner himself initiated*, reeks of the very kind of litigative gamesmanship that the MMA seeks to prevent.

**{90}**    Presbyterian's assignment will only compound Respondents' disadvantage going forward, as Respondents' ability to conduct discovery will be hindered by Presbyterian's dismissal from the suit. As Presbyterian is no longer a party to the proceedings, it is not amenable to discovery through interrogatories (Rule 1-033 NMRA), requests for admission (Rule 1-036 NMRA), or requests for production or deposition without subpoena (Rules 1-030(A), 1-034(C), 1-045 NMRA). This direct discovery likely will be critical to Respondents' defense. For example, one important issue at trial will be whether Respondent Gerety was Presbyterian's actual or apparent agent. *Cf. Houghland v. Grant*, 1995-NMCA-005, 119 N.M. 422, 891 P.2d 563 (discussing a hospital's vicarious liability for its actual or apparent agents). Although the question of actual agency may be a more straightforward issue of Presbyterian's right to control the details of Respondent Gerety's work, *id.* ¶ 9, the question of apparent agency will depend on a fact-specific inquiry into the actions and representations that Presbyterian made about Respondent Gerety in the course of treating Michael. *See, e.g., Chevron Oil Co. v. Sutton*, 1973-NMSC-111, ¶ 9, 85 N.M. 679, 515 P.2d 1283 ("The apparent authority of an agent is to be determined by *the acts of the principal* . . . from statements, conduct, lack of ordinary care, or other manifestation of the principal's consent, whereby third persons are justified in believing that the agent is acting within his authority" (emphasis added) (citation omitted)). Presbyterian thus possesses information essential to Respondents' defense on this and many other issues relevant to the indemnification claim. But, because of the assignment, Presbyterian is no longer fully amenable to discovery as a party to the litigation.

**{91}**    As if in some sort of consolation to this prejudicial assignment and dismissal, Petitioner points to his settlement agreement with Presbyterian, reflecting Presbyterian's contractual obligation to provide discovery upon request. But Respondents have no guarantee that Presbyterian will live up to its end of this bargain because Respondents are not a party to the settlement agreement. The risk of Presbyterian's noncompliance is real, considering the litigiousness of the prior proceedings, in which Petitioner filed not only several motions to compel discovery, but also motions to sanction Presbyterian for abuse of the discovery process. If, as is likely given prior conduct, Presbyterian fails to provide discovery requested by Respondents, then Respondents will be unable to ask the district court to sanction Presbyterian as provided under Rule 1-037(B) NMRA. Respondents will instead be limited to requesting the district court to hold Presbyterian in contempt of court under Rule 1-045(E). "Sanctions protect the discovery process by protecting the due process rights . . . to a meaningful hearing, protecting the truth-seeking function of the district court, and deterring future discovery abuse." *Reed v. Furr's Supermarkets, Inc.*, 2000-NMCA-091, ¶ 31, 129 N.M. 639, 11 P.3d 603 (brackets and internal quotation marks omitted). Respondents can no longer avail themselves of the vital safeguard provided by Rule 1-037(B).

**{92}**    Further, any discovery obtained by Respondents during the later course of litigation, several years after the alleged act of malpractice, has the risk of being stale, lost, or dimmed. Doubtless, too, much of this additional discovery will be duplicative, as

Respondents did not cross-examine witnesses in the preceding litigation and will need to retake many of these depositions in preparation of their defense.

**{93}**    In short, Respondents will be denied the opportunity for a full defense if the assignment is allowed to go forward. Respondents will now have to defend an indemnification claim against the representative of an aggrieved patient, who will "stand in the shoes" of Presbyterian in rights on the claim, but not in full capability. Notions of fairness implicit in the MMA mandate a meaningful, not truncated, opportunity to defend against malpractice claims, and due process requires, inter alia, "a chance to confront and cross-examine witnesses or evidence to be used against the individual." *Bd. of Educ. of Carlsbad Mun. Schs. v. Harrell*, 1994-NMSC-096, ¶ 25, 118 N.M. 470, 882 P.2d 511 (internal quotation marks and citation omitted). The majority's holding today unnecessarily puts in jeopardy this core constitutional right.

**{94}**    The procedural record before this Court thus aptly illustrates that nonassignability of malpractice claims can promote a swift and fair resolution to medical malpractice litigation. Our courts have previously recognized the procedural benefits of nonassignability. For example, New Mexico does not allow tort victims to assign the proceeds of their personal injury claims. *Quality Chiropractic*, 2002-NMCA-080, ¶ 25. The *Quality Chiropractic* Court reached this conclusion, in part, because it recognized that "allowing injured tort victims to assign the proceeds of their personal injury claims could add unnecessary complications to the settlement of relatively straightforward cases." *Id.*

**{95}**    I see similar motivating policy concerns at issue here. For example, Respondents did not have an opportunity to participate in settlement negotiations during the earlier litigation. Yet, we must assume that the settlement compensated Petitioner for Respondent Gerety's medical malpractice, as Presbyterian would have a viable claim for indemnification only if it discharged Respondents' malpractice liability. *See, e.g.*, *Gallagher*, 2008-NMSC-067, ¶ 25 (noting that the Restatement (Second) of Torts, § 886(B), "allows indemnification only when two persons are liable in tort to a third person for the same harm and one of them discharges the liability of both"). Because the settlement with Presbyterian presumably compensated Petitioner for Respondent Gerety's alleged malpractice, Petitioner may have less incentive to settle the indemnification claim. The majority does not adequately consider how this potential double recovery will de-incentivize settlement with qualified health care providers, which, considering the policies that motivated the Legislature to enact the MMA, should be of greater concern to this Court than encouraging settlement with nonqualified health care providers. *See maj. op.* ¶ 43 (suggesting the "additional inducement" of assignment encouraged Presbyterian to settle and that New Mexico policy favors this settlement).

**{96}**    Nor does the majority adequately consider the ramifications of its decision on the future course of medical malpractice litigation against qualified health care providers. The majority correctly notes that Respondents' stated concerns about the potential trafficking of indemnification claims are diminished, in part, by the other procedural requirements of the MMA. *Maj. op.* ¶ 51. However, the greater concern is that the

majority's decision to exempt indemnification claims from Section 41-5-12 will allow malpractice claimants, such as Petitioner, to obtain an "'end run around the MMA.'" *Baker*, 2013-NMSC-043, ¶ 35. The proceedings below likely will provide a near textbook example of how future malpractice claimants may evade the requirements and recovery limits of the MMA. A claimant need only (1) allege that a nonqualified provider is vicariously liable for a qualified provider's malpractice, (2) refuse to directly sue the qualified provider and wait for the nonqualified provider to assert a third-party claim for indemnification or contribution against the qualified provider, and then (3) obtain those third-party claims as part of a settlement agreement. Now the claimant, whose injuries were compensated through the settlement, can obtain a double recovery against the qualified provider that is also potentially in excess of the per-occurrence recovery limits in Section 41-5-6(A). *Cf. Hale*, 1990-NMSC-068, ¶ 20 ("New Mexico does not allow duplication of damages or double recovery for injuries received."); *Hood v. Fulkerson,* 1985-NMSC-048, ¶ 12, 102 N.M. 677, 699 P.2d 608 ("The general theory of damages is to make the injured party whole. Duplication of damages or double recovery for injuries received is not permissible." (citation omitted)).

{97}     With such a simple (and now judicially-approved) method for malpractice claimants to thwart the procedural safeguards and recovery limits of the MMA, one has to wonder whether health care providers will be willing to undertake the burdens of becoming qualified in the future. And I am not convinced that this practice of claimants obtaining assigned indemnification claims is as rare as the majority seems to believe. The fact that this Court has only now been asked to weigh in on the meaning of Section 41-5-12 does not establish that this "parade of horribles," *maj. op.* ¶ 50, has not been parading. If anything, the record before the Court shows that permitting assignment of malpractice claims can, and will, cause injustice and delay.

{98}     In summary, permitting assignment will frustrate a core purpose of the MMA. The mere inclusion of the word "patient" in Section 41-5-12 does not clearly express a legislative intent to allow malpractice claimants to engage in the troubling strategies on display in the litigation below, especially when the MMA so strongly evinces an intent to streamline medical malpractice litigation. *Cf. Baker*, 2013-NMSC-043, ¶ 15 ("If [p]laintiffs' interpretation . . . conflicts with the Legislature's purpose for enacting the MMA, then we cannot conclude that their interpretation reflects legislative intent."). Rather, construing Section 41-5-12 to prohibit assignment of Presbyterian's claim best protects and furthers the MMA's spirit and reason.

## 2.     Nonassignability promotes the MMA's recovery limits

{99}     Nonassignability also supports the MMA's per-occurrence recovery limits and protects against double recovery on malpractice claims. The majority asserts that Petitioner's recovery in this scenario is not double because the right of indemnification represents a separate property right asserted through a different theory of recovery, and because the qualified health provider's personal liability will be subject to the MMA's recovery limits. *Maj. op.* ¶¶ 40-44. While I agree with the majority on these two propositions as far they go, I fail to discern how these propositions support the majority's conclusion.

**{100}** First, there can be little dispute that the right to collect on an indemnity claim is a separate property right belonging to a tortfeasor who has discharged another tortfeasor's liability. *Maj. op.* ¶ 40. But Presbyterian's indemnification claim arises as a result of its joint and several liability with Respondents for the original malpractice claim. *Safeway, Inc.*, 2016-NMSC-009, ¶¶ 28-33 (limiting traditional indemnification to situations of vicarious liability and situations where the indemnitee is not actively at fault). Any indemnification damages Presbyterian may be entitled to recover necessarily would be for the *same conduct* of Respondent Gerety, and would seek recovery for payments made upon the *same damages* that Petitioner recovered in settlement of Presbyterian's joint and several liability. *See id.*; *Hale*, 1990-NMSC-068, ¶ 21 ("When a party may recover damages under separate theories of liability based upon the same conduct of the defendant . . . the court may make an award under each theory. In that event the prevailing party must elect between awards that have duplicative elements of damages."). Thus, any additional amounts Petitioner recovers from the indemnification claim would be duplicative of the compensatory damages Petitioner has already received in settlement of Presbyterian's joint and several liability. *See Sanchez v. Clayton*, 1994-NMSC-064, ¶ 6, 117 N.M. 761, 877 P.2d 567 ("To the extent a judgment for damages is paid by one or more of the judgment debtors, we agree that a claim for the *same damages* against any other person is extinguished regardless of the theories upon which the respective claims for relief are based"); *Summit Properties, Inc. v. Pub. Serv. Co. of N.M.*, 2005-NMCA-090, ¶¶ 45-46, 138 N.M. 208, 118 P.3d 716 (explaining that settlement funds paid by one joint obligor in discharge of its shared liability are duplicative of damages sought from the other joint obligor on that shared liability). This would be true, regardless of whether Petitioner recovers for those same damages under the theory of negligence or under the theory of indemnification, as our precedent recognizes that the *relief requested* is dispositive, and that the *theory of recovery and liability* is irrelevant. *See Hood*, 1985-NMSC-048, ¶ 12 ("Where there are different theories of recovery and liability is found on each, but the relief requested was the same, namely compensatory damages, the injured party is entitled to only one compensatory damage award."). Characterizing the recovery of these damages as "damages owing from one tortfeasor to another," *maj. op.* ¶ 41, is an exercise in semantics without a meaningful difference. It is still a recovery for the same damages twice. *Sanchez,* 1994-NMSC-064, ¶ 6; *Summit Properties*, 2005-NMCA-090, ¶¶ 45-46. The only possible conclusion is that Petitioner's recovery on Presbyterian's assigned claim would amount to a double recovery.

**{101}** Second, I agree with the majority that the amounts Petitioner may recover from Respondents, as qualified health providers, on the assigned claim will be subject to the MMA's recovery limits. *Maj. op.* ¶ 42. However, the majority fails to consider whether Petitioner's total compensation will exceed the *per-occurrence* recovery limits of the MMA. Section 41-5-6(A) ("[T]he aggregate dollar amount recoverable by all persons for or arising from any injury or death to a patient as a result of malpractice shall not exceed six hundred thousand dollars ($600,000) per occurrence."). A malpractice claimant could conceivably receive six hundred thousand dollars or more in settlement with a nonqualified health care provider and demand the nonqualified provider's indemnification claim against a qualified provider in additional consideration of the settlement. If that claimant then recovers on that indemnification claim, the claimant's

total recovery would exceed the per-occurrence recovery limits of Section 41-5-6(A). Nonassignability of malpractice claims thus supports the MMA's recovery limits, ensuring that all claimants who seek recovery for a qualified health provider's malpractice receive a total award within the overall damages cap. Section 41-5-6(A).

{102}  I also disagree with the majority's suggestion that we should tolerate any potential windfall in Petitioner's double recovery because Respondents may otherwise escape justice if assignment is prohibited. *See maj. op.* ¶ 52. Malpractice claimants may still pursue their claims directly against qualified health providers. And nothing prevents third-party indemnification claimants, such as Presbyterian, from pursuing their malpractice claims in their own right if they are not allowed to assign those claims. This Court cannot reasonably assume that Presbyterian would have simply declined to pursue recovery for any payments it made on behalf of Respondent Gerety's alleged malpractice if it had not assigned its claim to Petitioner. Thus, construing Section 41-5-12 to prohibit assignment of Presbyterian's malpractice claim will not permit qualified health providers to evade liability for their malpractice. On the other hand, permitting the assignment will needlessly complicate medical malpractice litigation in the future and contravene the spirit and reason of the MMA.

**C.     Section 41-5-12 Does Not Classify Malpractice Claims Based on the Identity of the Malpractice Claimant**

{103}  The majority narrowly interprets Section 41-5-12 as only prohibiting assignment of claims directly asserted by a patient against a qualified health provider, *maj. op.* ¶ 35, but, by implication, the majority would permit assignment of a nonpatient's claims that derive from the alleged malpractice. In doing so, the majority creates an unnecessary and unreasonable classification as between patient and nonpatient malpractice claimants. Our precedent has assiduously avoided creating this classification. *Wilschinsky*, 1989-NMSC-047, ¶¶ 25-26; *see also Cummings*, 1996-NMSC-035, ¶ 26 (rejecting a patient's equal protection challenge to the MMA in part because the MMA does not make "a classification based upon the character of plaintiff-patients . . . it is a classification based upon the character of defendant-health-care providers" (citation omitted)); *Garcia v. La Farge*, 1995-NMSC-019, ¶ 17, 119 N.M. 532, 893 P.2d 428 (rejecting an equal protection challenge to the MMA's statute of repose because the statute "classifies claims not according to the status or character of the plaintiff but according to the status or character of the *defendant*"), *overruled, in part, on other grounds by Cahn v. Berryman*, 2018-NMSC-002, ¶ 22, 408 P.3d 1012. I therefore cannot join the majority in construing Section 41-5-12 to create a classification based upon the identity of a malpractice claimant.

{104}  The reasoning and analysis of the *Wilschinsky* Court is highly persuasive and applicable to the question presented. In *Wilschinsky,* the Court considered whether a health care provider's duty of care extended to a nonpatient foreseeably harmed by a health care provider's medical malpractice. *Wilschinsky*, 1989-NMSC-047, ¶ 1. The provider in that case had administered judgment-impairing migraine medication to a patient during an office visit and then permitted that patient to drive away from the provider's office. *Id.* ¶ 3. Shortly afterwards, the patient caused a serious car accident

that injured a nonpatient. *Id.* ¶ 4. The nonpatient sued the provider, and the *Wilschinsky* Court held that the provider's duty of care extended to the nonpatient under these facts. *Id.* ¶ 14; *but cf. Lester ex rel. Mavrogenis v. Hall*, 1998-NMSC-047, ¶ 3, 126 N.M. 404, 970 P.2d 590 (refusing to recognize a health care provider's duty to a nonpatient for negligently prescribing medication outside of the facts presented in *Wilschinsky*).

**{105}** Because the provider in *Wilschinsky* was qualified under the MMA, an additional question arose as to whether the nonpatient's claim was covered under the Act. 1989-NMSC-047, ¶ 20. Although the nonpatient's claim was not contemplated under the narrowly construed statutory language, the *Wilschinsky* Court nevertheless concluded that the MMA should apply to the claim. *Id.* ¶¶ 25-26. "[I]f we recognize a third-party cause of action for [a nonpatient] and it is not covered by the Act, a [nonpatient] would be placed in a better position to achieve full recovery from an act of malpractice than would the patient malpracticed upon." *Id.* ¶ 25. Drawing a distinction between patients and nonpatients for purposes of malpractice liability would result in "an unreasonable classification . . . as only patients with direct injuries from acts of malpractice would be denied full recovery under the Act." *Id.* ¶ 26. The Court thus held that the nonpatient's malpractice claim "falls within the purpose of the New Mexico Medical Malpractice Act and should be pursued according to its guidelines." *Id.* ¶ 28. Applying this reasoning, our Court of Appeals subsequently recognized that a hospital's claim for indemnification against a qualified provider should also be considered a "malpractice claim" subject to the requirements of the MMA. *Duarte-Afara*, 2011-NMCA-112, ¶ 18.

**{106}** The majority expressly acknowledges this line of precedent. *Maj. op.* ¶ 17. Yet, the majority may not fully perceive the wisdom of this precedent's approach. By deciding that nonassignability under Section 41-5-12 applies only to claims asserted by a "natural person who received or should have received health care," § 41-5-3(E), the majority creates a strained and artificial distinction between malpractice claims asserted by a patient and malpractice claims asserted by a nonpatient.

**{107}** While the majority does not specifically identify what rationale might support this classification, the majority nonetheless suggests that the Legislature might have adopted Section 41-5-12 in recognition of a common law prohibition of assignment of personal injury claims. *Maj. op.* ¶ 47-48. But this assumption contradicts our precedent, which specifically recognizes that the MMA was enacted to "restrict[] and limit[] plaintiffs' rights under the common law." *Wilschinsky,* 1989-NMSC-047, ¶ 21; *see also Siebert*, 2021-NMSC-016, ¶ 27 (recognizing that "the Legislature intended to change how the courts facilitate and administer remedies when a plaintiff brings a medical malpractice action against a qualified health care provider under the MMA."). In any case, the common law does not support the majority's classification. The common law classifies between assignable and nonassignable claims based on the type of claim asserted (e.g., personal injury), and not based on the identity of the claimant (i.e., patient or nonpatient). *See, e.g., Kandelin*, 1933-NMSC-058, ¶ 37 ("As a general rule, a right of action *for a tort* purely personal, in the absence of statute, is not subject to assignment before judgment. Such are *causes of action* for injuries to the person." (emphasis added)).Thus, mere codification of the common law could not provide the legal rationale upon which this classification could have been based.

**{108}** Even the *Wilschinsky* claimant was a nonpatient who sought recovery for personal injuries, 1989-NMSC-047, ¶ 4, further undermining the majority's supposed rationale for its construed classification. According to the majority, the *Wilschinsky* claimant would not be prohibited from assigning her personal injury claims under Section 41-5-12, while a similarly situated patient would be so prohibited. This is exactly the type of classification between malpractice claimants that the *Wilschinsky* Court recognized as "unreasonable." *See* 1989-NMSC-047, ¶ 26. As the Legislature has not clearly distinguished between malpractice claimants based on their identity as a patient or a nonpatient, the Court should follow the wisdom of *Wilschinsky* and avoid construing Section 41-5-12 to create this classification.

**{109}** Similarly, the majority creates an unreasonable classification between those patients and their representatives who, like Petitioner here, are able to obtain an assignment of an indemnification claim against a qualified health provider, and those patients and their representatives who are unable to obtain such an assignment, even if the underlying act of malpractice and resulting damages are the same. Under the majority's formulation, the former class of patients will have the ability to collect an overall recovery in excess of the MMA recovery limits, § 41-5-6, but the latter class will not. The MMA should not be construed to create such an "unreasonable classification" among similarly situated malpractice claimants. *Wilschinsky*, 1989-NMSC-047, ¶ 26.

## III.     CONCLUSION

**{110}** For the foregoing reasons, I respectfully dissent. I would hold that "a patient's claim for compensation under the [MMA]," § 41-5-12, is a "malpractice claim," § 41-5-3(C). Section 41-5-12 thus disallows assignment of Presbyterian's malpractice claim. For the reasons stated above, in addition to the persuasive reasoning of the Court of Appeals' majority opinion, I would affirm the Court of Appeals.

**JAMES M. HUDSON, Judge**
**Sitting by designation**

**I CONCUR:**

**JUDITH K. NAKAMURA, Justice, retired**
**Sitting by designation**